```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------X
SIMON GORIS,

                    Plaintiff,           MEMORANDUM AND ORDER
                                         04-CV-5666(KAM)(LB)
        -against-


DENNIS BRESLIN, et al.,

                    Defendants.
------------------------------------X
```

**MATSUMOTO, United States District Judge:**

Plaintiff Simon Goris commenced the pending action against defendants Dennis Breslin, Francois Thebaud, M.D., Gail Buswell, R.N., Syed Haider-Shah, M.D., and Lester Wright, M.D., pursuant to 42 U.S.C. § 1983 seeking monetary relief for alleged deliberate indifference to his serious medical needs in violation of the Eighth Amendment. Plaintiff allegedly sustained a knee injury while incarcerated at the Arthur Kill Correctional Facility in February 2003.

Pending before the court is the Buswell, Haider-Shah, and Wright defendants' motion for summary judgment. For the following reasons, defendants' motion is granted.

## BACKGROUND

### I. Procedural History

Plaintiff commenced this action pro se on December 20, 2006, against defendants Dennis Breslin, Francois Thebaud,

1

M.D.,[1] Gail Buswell, R.N., Syed Haider-Shah, M.D., and Lester Wright, M.D., alleging that defendants were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment.  Upon defendants' motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1), (6), and (3), Judge Amon dismissed plaintiff's claim against defendant Dennis Breslin, the Superintendant of Arthur Kill Correctional Facility, in an order on May 10, 2006.  Discovery proceeded with the remaining defendants.

On November 13, 2007, plaintiff obtained pro bono counsel.  Discovery closed on June 30, 2008 and defendants sought leave to file the pending summary judgment motion, which was filed on behalf of defendants Buswell, Haider-Shah, and Wright on October 27, 2008.  The court held an oral argument on November 17, 2008.

## II.  **Undisputed Material Facts**

The court's reliance on the defendants' experts' affidavit is limited to the undisputed facts, as reflected in the plaintiff's medical records, regarding the dates and nature of any medical care rendered, and any recommendations for

---

[1]  On August 25, 2008, Dr. Thebaud passed away, terminating his representation by the State.  On March 25, 2009, upon a motion by plaintiff, the Public Administrator of Suffolk County was substituted for Dr. Thebaud.

medical care made.[2] The undisputed material facts, as set forth in the current record and the parties' Rule 56.1 Statements, are as follows.

Plaintiff is a former inmate in the custody of the New York State Department of Correctional Services. (R. 56.1 Stmts. ¶ 1.) On February 9, 2003, while playing basketball at the Arthur Kill Correctional Facility ("Arthur Kill"), plaintiff sustained an injury to his right knee. (Goris Aff. ¶ 2, 29.)

On February 11, 2003, plaintiff was examined by Dr. Thebaud, who ordered an x-ray of plaintiff's knee. (Goris Aff. ¶ 6.) Plaintiff received the x-ray on February 13, 2003 and was told a few weeks later that the x-ray results were negative. (Goris Aff. ¶ 6.) The x-ray indicated no bone fracture. (R. 56.1 Stmts. ¶ 2.) Plaintiff told Dr. Thebaud that he was still in pain; Dr. Thebaud subsequently ordered an MRI for plaintiff's knee. (Goris Aff. ¶ 6.)

On April 7, 2003, Dr. Thebaud ordered an orthopedic consultation for plaintiff at Staten Island University Hospital. (R. 56.1 Stmts. ¶ 3.) Plaintiff saw an orthopedic consultant on May 14, 2003, who recommended physical therapy, anti-

---

[2] After the instant motion was fully submitted, plaintiff made a pre-motion conference request on June 18, 2009 to strike the declaration of defendants' expert, Dr. Edward Habermann, who passed away in April 2009. Without expressing a view regarding the plaintiff's proposed motion to strike, the court does not consider Dr. Habermann's expert opinion in deciding the instant motion.

inflammatory medication and an MRI of the right knee. (R. 56.1 Stmts. ¶ 4.) Based on this recommendation, Dr. Thebaud ordered a physical therapy consultation and an MRI. Plaintiff had physical therapy in June and July of 2003. (R. 56.1 Stmts ¶ 5.)

On June 16, 2003 an MRI was performed, which showed an ACL tear, medial meniscal oblique tear of body and posterior horn with mild to moderate degenerative changes (arthritis) manifested by joint space narrowing and osteophyte formation. (R. 56.1 Stmts. ¶ 6.) On July 3, 2003, plaintiff was told these results after physical therapy. (R. 56.1 Stmts. ¶ 7; Goris Aff. ¶ 9.)

On July 23, 2003, plaintiff again was seen by an orthopedic surgeon who prescribed ongoing physical therapy and directed that plaintiff not engage in prolonged activity with the right knee. (R. 56.1 Stmts. ¶ 7.) The orthopedic surgeon recommended plaintiff return to an orthopedist in three weeks. On August 5, 2003, Dr. Thebaud referred plaintiff for a follow-up consultation with an orthopedic surgeon, as recommended during the July 23rd visit. (R. 56.1 Stmts. ¶ 8.) Plaintiff saw an orthopedist on September 17, 2003, who recommended physical therapy and anti-inflammatory pain medication. (R. 56.1 Stmts. ¶ 8.) Per this recommendation, Dr. Thebaud referred plaintiff for physical therapy on September 18, 2003, which plaintiff received through April 2004. (R. 56.1 Stmts. ¶ 8.)

On January 21, 2004, according to medical records, plaintiff indicated to his physical therapist that his knee felt better and that he did not have buckling of the knee. (R. 56.1 Stmts. ¶ 9.) Medical records from March 16, 2004 indicate that plaintiff had improvement with his knee: an increase of strength and a decrease of pain. (R. 56.1 Stmts. ¶ 10.)

On July 19, 2004, plaintiff complained to Dr. Thebaud of knee pain. (R. 56.1 Stmts. ¶ 12.) Dr. Thebaud referred plaintiff to an orthopedic surgeon, and an appointment was scheduled for August 2004. (R. 56.1 Stmts. ¶ 12.) Plaintiff was never seen by the orthopedist in August 2004. (R. 56.1 Stmts. ¶¶ 12, 19, 21.)

On August 13, 2004, plaintiff was transferred from Arthur Kill to Downstate Correctional Facility, then to Ulster Correctional Facility, and finally, on August 17, 2004, to Marcy Correctional Facility ("Marcy"). (R. 56.1 Stmts. ¶ 19; Goris Aff. ¶ 26.) On August 19, 2004, Nurse Buswell reviewed plaintiff's medical chart and made an appointment for him to see one of the physicians at Marcy. (R. 56.1 Stmts. ¶ 39.) She noted that plaintiff needed a new referral for an orthopedist. (R. 56.1 Stmts. ¶ 39.) When plaintiff was transferred from Marcy, Nurse Buswell saw plaintiff numerous times between August 19, 2004 and December 14, 2004 for a variety of issues, including complaints of knee pain. (R. 56.1 Stmts. ¶ 40.) With

respect to plaintiff's complaints of knee pain, Nurse Buswell recommended that plaintiff do quad strengthening exercises, as recommended by physicians, and offered him ibuprofen. (R. 56.1 Stmts. ¶ 43.) Additionally, she scheduled four appointments with physicians during the four months plaintiff was at Marcy. (R. 56.1 Stmts. ¶ 44.)

On August 24, 2004, plaintiff was first seen by Dr. Haider-Shah. Plaintiff complained of right knee pain. Dr. Haider-Shah advised plaintiff to do quad strengthening exercises after examining plaintiff's knee and his MRI, which indicated no physical findings in the knee. (R. 56.1 Stmts. ¶ 24.)

On August 30, 2004, plaintiff wrote to Dr. Wright, the Deputy Commissioner and Chief Medical Officer of the Department of Correctional Services, pertaining to plaintiff's injury. (R. 56.1 Stmts. ¶ 67, 71.) Pedro Diaz, Regional Health Services Administrator, investigated the issues and responded to plaintiff's letter on behalf of Dr. Wright. (R. 56.1 Stmts. ¶ 74.) Plaintiff additionally states that he sent a letter to Dr. Wright while he was at Arthur Kill. (Goris Aff. ¶ 44.)

On September 29, 2004, plaintiff was seen by Dr. Vadlamudi, the Marcy Medical Director and non-party, who noted plaintiff's history of problems with his knee. (R. 56.1 Stmts. ¶ 32.) Dr. Vadlamudi saw plaintiff again on November 9, 2004 and noted that plaintiff did not have any knee swelling and

6

"that his range of motion was okay," along with reports of pain in two places. Dr. Vadlamudi suggested quad strengthening exercises and ibuprofen for his knee pain. (R. 56.1 Stmts. ¶ 33.)

Dr. Haider-Shah visited plaintiff in his cell on November 30, 2004 to review lab work regarding plaintiff's cholesterol. (R. 56.1 Stmts. ¶ 34.) Plaintiff again complained to Dr. Haider-Shah of knee pain. (R. 56.1 Stmts. ¶ 34.) The parties dispute Dr. Haider-Shah's response. (Haider-Shah Dep. at 208-209; Goris Aff. ¶ 42.)

On December 15, 2004, plaintiff was transferred from Marcy to Elmira Correctional Facility ("Elmira"). On December 28, 2004, plaintiff was seen by a physician. (R. 56.1 Stmts. ¶ 46; Goris Aff. 49-50.) On February 25, 2005, plaintiff was sent to a new orthopedic consultant who recommended surgery. (R. 56.1 Stmts. ¶ 46; Goris Aff. ¶ 51.) He underwent surgery on September 20, 2005. (R. 56.1 Stmts. ¶ 47; Goris Aff. ¶ 51.)

## DISCUSSION

### III. Summary Judgment Standard

A court may grant summary judgment only "if the pleadings, the discovery and disclosure materials on file, and any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The

7

moving party carries the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In deciding a motion for summary judgment, the court's function is not to resolve disputed issues of fact, but only to determine whether there is a genuine issue to be tried. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). The court must construe the facts in the light most favorable to the nonmoving party and all reasonable inferences and ambiguities must be resolved against the moving party. Flanigan v. Gen. Elec. Co., 242 F.3d 78, 83 (2d Cir. 2001).

Nevertheless, the nonmoving party cannot rest on "mere allegations or denials" but must instead "set forth specific facts showing there is a genuine issue for trial." Fed. R. Civ. P. 56(e); see also National Westminster Bank USA v. Ross, 676 F. Supp. 48, 51 (S.D.N.Y. 1987) ("Speculation, conclusory allegations, and mere denials are not enough to raise genuine issues of fact."); Harlen Assocs. v. Incorporated Vill. of Mineola, 273 F.3d 494, 499 (2d Cir. 2001) ("[M]ere speculation and conjecture is [sic] insufficient to preclude the granting of the motion.").

Nor can the nonmoving party rest only on the pleadings. Celotex, 477 U.S. at 324 (Fed. R. Civ. P. 56(e) "requires the nonmoving party to go beyond the pleadings"); Davis v. New York, 316 F.3d 93, 100 (2d Cir. 2002). Instead,

each statement of material fact by the movant or opponent must be followed by citation to evidence which would be admissible, as required by Fed. R. Civ. P. 56(e) and Local Civil Rule 56.1(d).  Moreover, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  Anderson, 477 U.S. at 247-48 (emphasis in original).  No genuine issue of material fact exists "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable, . . . or is not significantly probative, . . . summary judgment may be granted."  Id. at 249-50 (internal citations omitted).

### IV. Eighth Amendment Claim for Deliberate Indifference to Serious Medical Needs

An Eighth Amendment claim against prison officials arising out of allegedly inadequate medical treatment, requires proof of "deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 104 (1976).  To establish deliberate indifference constituting "a constitutional violation under the Eighth Amendment, an inmate must meet both an objective and a subjective requirement." Griffin v. Crippen, 193 F.3d 89, 91 (2d Cir. 1999).

Under the objective prong, the plaintiff must establish "that an official 'denied [the patient] treatment needed to remedy a serious medical condition.'" Mills v. Fenger, 216 Fed. App'x 7, 10 (2d Cir. 2006) (quoting Weyant v. Okst, 101 F.3d 845, 856 (2d Cir. 1996)). Under this prong, "the prisoner must prove that his medical need was 'a condition of urgency, one that may produce death, degeneration, or extreme pain.'" Johnson v. Wright, 412 F.3d 398, 403 (2d Cir. 2005) (quoting Hemmings v. Gorczyk, 134 F.3d 104, 108 (2d Cir. 1998)).

Under the subjective prong of the analysis, the plaintiff must prove that that the official denied treatment with a "sufficiently culpable state of mind." Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994). This requires that the prison official "'know of and disregard an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must draw the inference.'" Hathaway, 37 F.3d at 66 (citing Farmer v. Brennan, 114 S. Ct. 1970, 1979 (1994)). To demonstrate this prong of the deliberate indifference standard, officials must "'intentionally deny[] or delay[] access to medical care or intentionally interfere with the treatment once prescribed.'" Demata v. N.Y.S. Corr. Dept. of Health Servs., No. 99-0066, 1999 U.S. App. LEXIS 22955, at *5 (2d Cir. Sept. 17, 1999) (quoting Estelle, 429 U.S. at 104-05).

10

The Second Circuit has reserved classifying delays in providing necessary medical care as "deliberately indifferent" for "cases in which, for example, officials deliberately delayed care as a form of punishment, ignored a 'life-threatening and fast-degenerating' condition for three days, or delayed major surgery for over two years." Demata, 1999 U.S. App. LEXIS 22955, at *5 (citations omitted).

Because the undisputed facts in this case demonstrate that plaintiff cannot establish that the defendants acted with the requisite culpable mental state, the court need not address whether plaintiff's injury constitutes a "serious medical condition" for purposes of the Eighth Amendment. In the Second Circuit's Demata decision, the Circuit addressed facts similar to those presented here. Although Demata is a summary order, the court finds the Second Circuit's analysis persuasive. 1999 U.S. App. LEXIS 22955.

In Demata, the plaintiff alleged that defendant prison officials failed to respond to numerous medical complaints, including injuries to both knees, an ulcer, and hemorrhoids. Id. at *2. Of particular significance in Demata is the plaintiff's allegations regarding the treatment he received for a knee injury sustained while incarcerated. Id. at *2-3. Demata reported his knee injury to the nurse on duty the day he sustained it in February 1994, and continued to complain of

related difficulty for months thereafter. Id. at *2-3. In September 1994, an MRI was performed and the knee was examined by an orthopedist. Id. at *3. The orthopedist prescribed physical therapy, an injection, and knee supports. Demata had several more orthopedic consultations. Id. at *3. Between the fall of 1995 and May 1996, Demata complained of knee pain and was given Tylenol. Id. at *3. His complaints became more frequent in May 1996 and strength exercises were prescribed. Id. at *3. Additional consultations and MRIs followed and in March 1997, three years after sustaining the injury, Demata had knee surgery. Id. at *3.

In affirming the district court's grant of summary judgment in favor of the defendant nurse and doctors, the Demata court stated that "strengthening exercises are a form of medical care" and the fact that the plaintiff "[felt] something more should have been done to treat his injuries is not a sufficient basis for a deliberate indifference claim." Id. at *5-7. Further, plaintiff's "mere disagreement with [strengthening exercises as a] form of care does not establish deliberate indifference." Id. at *7.

However, the Demata court vacated the district court's grant of summary judgment with regard to two of Demata's Eighth Amendment claims against the Medical Director of the prisons. The Demata court found that the factual record was insufficient

12

to determine whether the medical director, who defended the denial of physical therapy on the basis that the treatment was unavailable, knew of the therapy recommendation and any harmful consequences of failing to provide it. Id. at *14. Additionally, the court remanded to develop to record as to whether the fact that the plaintiff was recommended and scheduled for a colonoscopy that he never received while under the Director's care constituted an Eighth Amendment violation because a "[f]ailure to heed a physician's recommendation regarding treatment may in some circumstances constitute deliberate indifference." Id. at *16-17.

### V. Application of Eighth Amendment Analysis to Defendants Buswell, Haider-Shah, and Wright

The undisputed material facts establish that, during plaintiff's four-month stay at the Marcy facility, defendants Buswell, Haider-Shah, and Wright did not intentionally deny or delay access to plaintiff's medical care, or interfere with the treatment once prescribed. Thus, defendants were not deliberately indifferent to plaintiff's medical needs within the meaning of the Eighth Amendment. See Demata, 1999 U.S. App. LEXIS 22955 at *4. In comparison to Demata, who received surgery three years after his injury, the plaintiff ultimately had surgery approximately two and a half years after initially sustaining his injury and, after a period of improvement in

13

early 2004, just over a year after his condition regressed. Like the plaintiff in Demata, plaintiff in this case was prescribed strengthening exercises and Tylenol, was referred to orthopedists, and received an MRI. Additionally, both plaintiffs were told the results of their MRIs and x-rays. See, contra, Hathaway, 37 F.3d at 67 (finding that a jury could find a physician deliberately indifferent and "[m]ost telling is the fact that [the physician] never informed [plaintiff] that he had two broken pins in his hip" as revealed in the x-ray). In light of the similarities between the general care received by Demata and that received by plaintiff, the court will address plaintiff's claims against the individual defendants in turn.

1. Nurse Buswell

Plaintiff argues that Nurse Buswell "did nothing to assist [him] in alleviating his pain or to help heal his injury" and "even failed to speak with the doctors at Marcy, Dr. Haider-Shah, and Dr. Vadlamudi about . . . ways to help him." (Pl. Opp'n. at 28.) However, as the plaintiff acknowledges, Nurse Buswell visited plaintiff at least twenty-five times during the four months he was at Marcy. (Pl. Opp'n. at 27.) In response to plaintiff's complaints of knee pain, she instructed him to follow the treatment regime prescribed by the physicians and offered him Tylenol. Additionally, she scheduled plaintiff for

four appointments with the Marcy physicians. Upon plaintiff's arrival at Marcy, Nurse Buswell noted that plaintiff needed a new orthopedist referral. In light of these undisputed facts in the record, Nurse Buswell did not delay, deny, or interfere with plaintiff's medical treatment, let alone do so intentionally. Accordingly, Nurse Buswell is entitled to summary judgment.

### 2. Dr. Haider-Shah

Likewise, based on the record presented, a reasonable fact-finder could not infer that Dr. Haider-Shah intentionally delayed or denied plaintiff medical treatment based on the two visits he had with plaintiff. At the first visit, on August 24, 2004, after examining plaintiff's knee and the MRI which indicated no physical findings for his knee, Dr. Haider-Shah prescribed strengthening exercises and ibuprofen, which the Second Circuit acknowledged is an appropriate form of medical treatment for a knee injury. Demata, 1999 U.S. App. LEXIS 22955 at *7. Dr. Haider-Shah never referred plaintiff to an orthopedist; however, there is nothing in the record to suggest that this was done with an intention to delay or deny him medical care. The record reflects that Dr. Haider-Shah reviewed plaintiff's records and his MRI, and examined his knee, and came to an independent conclusion that there were no physical findings and, therefore, a referral was unnecessary. (Haider-

Shah Dep. at 168.)  Dr. Haider-Shah's conclusion is bolstered by the fact that plaintiff's subsequent appointments with Dr. Vadlamudi resulted in identical treatment prescriptions.

Dr. Haider-Shah visited plaintiff a second time in November 2004 with regard to plaintiff's cholesterol.  Plaintiff was not called out of his cell for this visit, so Dr. Haider-Shah did not examine plaintiff's knee.  Plaintiff again complained of his knee and Dr. Haider-Shah again instructed him to continue with the strengthening exercises.  (Haider-Shah Dep. at 207-209.)  In his affidavit, plaintiff stated, "[Dr. Haider-Shah] told me that if I did not stop complaining, he would not come to see me anymore" when plaintiff complained about his knee during this visit.  (Goris Aff. ¶ 27.)  This statement does not establish a genuine issue of material fact as to whether Dr. Haider-Shah was deliberately indifferent to plaintiff's medical needs or had the requisite intent.  Had there been evidence that Dr. Haider-Shah subsequently denied or delayed plaintiff's medical care, plaintiff's affidavit might raise a genuine issue of fact regarding Dr. Haider-Shah's intent.  However, plaintiff was transferred from Marcy two weeks later and Dr. Haider-Shah never had occasion to treat plaintiff again.  Therefore, even assuming, based on this evidence, that a reasonable juror could conclude that Dr. Haider-Shah had the culpable state of mind, his conduct was not so egregious as to rise to a constitutional

violation.  As a result, summary judgment in favor of Dr. Haider-Shah is granted.

### 3. Dr. Wright

Finally, summary judgment is granted in favor of Dr. Wright because, even if there was a constitutional violation, plaintiff has failed to allege sufficient personal involvement of Dr. Wright.  "A supervisory official is liable for constitutional violations if he or she (1) directly participated in the violation; (2) failed to remedy the violation after learning of it through a report or appeal; (3) created a custom or policy fostering the violation or allowed the custom or policy to continue after learning of it; or (4) was grossly negligent in supervising subordinates who caused the violation." Sealey v. Giltner, 116 F.3d 47, 51 (2d Cir. 1997).

According to plaintiff, he wrote to Dr. Wright twice and received two responses from individuals who were not Dr. Wright.  The facts fall far short of the requisite involvement of a supervisory official for liability pursuant to Section 1983.  By referring plaintiff's letters for investigation and response, Dr. Wright took the appropriate steps to address plaintiff's complaints.  He is not under an obligation to personally review, investigate and respond to every one of the thousands of letters dealt with by his staff.  See Sealey v.

Coughlin, 857 F. Supp. 214, 218 (N.D.N.Y. 1994), affirmed 116 F.3d at 51. Furthermore, there is no evidence of gross negligence in his supervision of his staff. Dr. Wright is entitled to summary judgment.

For the foregoing reasons, the defendants' motion for summary judgment is granted.

### VI. Qualified Immunity

Furthermore, even if the defendants' conduct rises to the level of a constitutional violation, they are entitled to qualified immunity and their motion for summary judgment is granted on this basis. "The qualified immunity doctrine insulates a governmental official performing discretionary functions from liability as long as his 'conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Eng v. Coughlin, 858 F.2d 889, 895 (2d. Cir. 1988) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). The inquiry turns on "the 'objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken.'" Pearson v. Callahan, 129 S. Ct. 808, 822 (2009). When an official "reasonably believes that his or her conduct complies with the law," qualified immunity shields him or her from liability. Id. at 823.

18

The general constitutional right of a prisoner to be free from deliberate indifference to his or her serious medical needs was clearly established at the time of the events giving rise to this action. See Estelle, 429 U.S. at 104. The Supreme Court has never specifically addressed whether the conduct evidenced in the undisputed facts in this record constitutes deliberate indifference. Nevertheless, the court finds, in light of the Second Circuit's summary order in Demata, 1999 U.S. App. LEXIS 22955, discussed at length above, that the defendants reasonably believed that their conduct complied with the law. Pearson, 129 S. Ct. at 823 (the unlawfulness of the officers' conduct in entering the plaintiff's home without a warrant was not clearly established because lower court decisions at the time held that similar conduct was constitutional). As a result, if any of the defendant's conduct, as established in the current record, constituted a constitutional violation, the unlawfulness of that conduct was not clearly established. Therefore, defendants are entitled to qualified immunity and summary judgment is granted in their favor.

## CONCLUSION

Defendants' motion for summary judgment is granted with respect to Gail Buswell, R.N., Syed Haider-Shah, M.D., and Lester Wright, M.D. because there exists no genuine issue of

material fact as to whether defendants acted with deliberate indifference.  Alternatively, defendants are entitled to qualified immunity.  The Clerk of the Court is directed to enter judgment in favor of defendants Gail Buswell, R.N., Syed Haider-Shah, M.D., and Lester Wright, M.D.

**SO ORDERED.**


Dated: July 6, 2009
       Brooklyn, New York

                                    _____   /s/_____ _____
                                    KIYO A. MATSUMOTO
                                    United States District Judge
                                    Eastern District of New York